**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

AssuredPartners of California Insurance Services LLC,

Plaintiff,

v.

Mary Pahl, et al.,

Defendants.

No. CV-25-00693-TUC-RM

**ORDER**

Pending before the Court is Plaintiff's Motion for Preliminary Injunction (Doc. 61) and Defendants' Motion to Strike (Doc. 87). The Motion for Preliminary Injunction is fully briefed. (Docs. 66, 78.) Plaintiff filed a Response to the Motion to Strike. (Doc. 88.) For the following reasons, the Court will grant in part and deny in part the Motion for Preliminary Injunction, and deny the Motion to Strike.

## I.      Background

On December 15, 2025, Plaintiff initiated this action by filing a Complaint (Doc. 1) and paying the associated fees. Plaintiff is a California limited liability company that provides "insurance products and services to businesses located in Arizona and throughout the nation." (Doc. 1 at 5.) The Court granted leave to conduct expedited discovery in the above-captioned matter on January 26, 2026, in order to allow the parties to gather information relevant to Plaintiff's forthcoming request for injunctive relief. (Doc. 22.) The expedited discovery process is now complete, and relevant facts appear as follows. (Doc. 61.)

Defendant Mary Pahl was employed by Plaintiff from August 2023 to November 2025. (*Id.* at 2.) Pahl was employed as a "Commercial Account Representative," responsible for providing day-to-day administrative services to Plaintiff's clients. (*Id.* at 2-3.) Such services included "maintaining lists of a client's insured assets such as vehicles and properties, issuing insurance certificates, and ensuring clients had up-to-date records." (Doc. 66 at 2.) On August 14, 2023, Pahl entered into a Restrictive Covenants Agreement ("the Agreement") with Plaintiff. (Doc. 61-1.)

The Agreement states that "Employee shall not take, copy, duplicate in any way, use, or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of Employee's employment." (*Id.* at 11.) This restriction applies to "Confidential Information that is not a trade secret" for eighteen months after "Employee's employment with Company ends." (*Id.*) The term "Confidential Information" is defined as "all Trade Secrets and other information that is proprietary, private, and not generally known or accessible to members of the public or competitors of Company." (*Id.*)

The Agreement further states that for eighteen months after the conclusion of Employee's employment, "Employee shall not directly or indirectly . . . solicit, sell, provide, or renew any Insurance Products or Related Services to any Restricted Client . . . or service any Insurance Products or Related Services on behalf of any Restricted Client[.]" (*Id.* at 11-12.) The term "Restricted Client" is defined as "any client of Employer Group during the twelve months immediately preceding the date upon which Employee's employment with Company ends . . . as to which Employee received any . . . compensation; or for which Employee had material and ongoing involvement in soliciting, selling, providing, renewing or servicing any Insurance Products or Related Services; or about whom Employee received material Confidential Information[.]" (*Id.* at 12-13.)

On October 6, 2025, Pahl accepted an offer of employment with Liberty Company Insurance Brokers LLC ("Liberty"), the other Defendant in this action. (Doc. 61 at 4.) Liberty is a competitor to Plaintiff. (*Id.* at 3.) During her time at AssuredPartners, Pahl had worked as a team with Jenna Farrell, a "Commercial Account Manager," primarily

- 2 -

responsible for managing policy renewals, and Raymond Clem, a "Producer," primarily responsible for generating business and maintaining client relationships. (Docs. 70, 72.) Clem, Farrell, and Pahl all departed AssuredPartners in order to begin employment at Liberty on or about the same date. (*Id.*) Pahl continued her employment with Plaintiff until November 17, 2025, when she resigned through a letter sent by an attorney obtained for her by Liberty. (*Id.* at 6.) Pahl commenced employment with Liberty the same day. (*Id.*)

Between October 6, 2025, and November 17, 2025, Pahl set out to gather Plaintiff's client information for future use at Liberty. (*Id.* at 5-6.) There are two key document types containing information that Pahl sought to collect; these include Certificate Issuance Documents ("CIDs") and Certificate Holder Lists ("CHLs"). (Doc. 66 at 3-4.) Pahl took pictures of her work laptop screen using her personal phone in order to capture CIDs. (Doc. 61 at 5.) In order to capture CHLs, Pahl emailed the documents to Plaintiff's clients prior to her resignation from Plaintiff's employ, and then after commencing employment at Liberty, requested that the clients send her the information back. (Doc. 61 at 5-6.)

CIDs are "templates that summarize the schedule of forms and endorsements page in the client's insurance policies." (Doc. 66 at 3.) CIDs identify "what certificates of insurance may issue under each policy, which require the client to purchase additional coverage, and what policy endorsements maybe attached to each issued certificate." (*Id.* at 4.) While CIDs may be used to determine whether a particular certificate of insurance is included in a client's policy, "that information is equally available from the policy itself." (*Id.*)

A CHL is a "list of the third-party holders of certificates of insurance that have been issued to the client." (*Id.*) A CHL reflects "the entities (the certificate holders) to which the client has provided a certificate proving that it has insurance, as well as the certificate holders' addresses, contact information, and basic notes about the relationship between the insured and the certificate holder." (*Id.*) Therefore, a CHL is composed of information that is provided to Plaintiff by its clients. (*Id.*)

After Pahl joined Liberty, she used the photographs she had taken of CIDs in order

to "input client information into Liberty's systems," and as discussed above, requested that the clients to which she had sent CHLs send those documents back to her. (Doc. 66 at 7.) Plaintiff states that it suffered an unusually high volume of client attrition in November 2025 following Pahl's departure, and that the rapidity with which Plaintiff lost clients was directly attributable to the competitive advantage afforded by the information Pahl collected. (*Id.* at 7.) However, around three dozen clients qualifying as Restricted under the Agreement entered into between Pahl and Plaintiff remain with Plaintiff. (*Id.* at 8.)

Based upon the foregoing events, Plaintiff has brought various claims against Pahl and Liberty. (Doc. 1.) For the purposes of Plaintiff's Motion for Preliminary Injunction, however, Plaintiff argues that it has a likelihood of success on the merits on its claims for violation of the federal Defend Trade Secrets Act and the Arizona Uniform Trade Secrets Act (asserted against both Pahl and Liberty) and its claim for breach of contract (asserted against Pahl). (Doc. 61.) A hearing was held before the Court regarding Plaintiff's Motion for Preliminary Injunction on May 11, 2026. (Doc. 85.)

## II. Motion to Strike

During the hearing held on May 11, 2026, the Court noted that the only examples of CIDs and CHLs included as part of the record in this matter were examples of each submitted by Defendants as exhibits to the Declaration of Mary Pahl. (Doc. 74.) The exhibits consisted of one CHL and an accompanying email sent by Pahl to a client prior to her departure from AssuredPartners, and three photographs of CIDs that Pahl took using her cell phone prior to her departure from AssuredPartners. (*Id.*) Given that the photographs of the CIDs were, more accurately, photographs of a laptop screen upon which the original CID documents were displayed, the information contained in the images was not easily legible. Accordingly, the Court requested that Plaintiff supplement the record with additional examples of CHLs and CIDs, in order to clearly see and understand the compilations of information that Plaintiff alleges are a trade secret. (Doc. 85 at 64.)

Counsel for Defendants orally objected at the hearing to the supplementing of the record, arguing that the time for Plaintiffs to establish the existence of a trade secret had

passed, and the introduction of the requested information would be tantamount to allowing Plaintiffs to assert an entirely new trade secret theory. (*Id.* at 61.)

After Plaintiff filed a Notice of Service of Discovery (Doc. 86), informing the Court that Plaintiff had transmitted a USB drive containing the requested documents to the Court and shared the same with Defendants, Defendants filed a Motion to Strike (Doc. 87). In the Motion to Strike, Defendants argue that Plaintiffs improperly submitted a vast number of certificates of insurance to the Court, and that Plaintiffs should not now be allowed to contend that those certificates are trade secrets. (Doc. 87.) In its Response to the Motion to Strike, Plaintiff clarifies that "AssuredPartners does not contend the Certificates of Insurance themselves are trade secret documents—only the CIDs and the CHLs. The Certificates of Insurance were included with Plaintiff's May 18 submission because they were intertwined with the CID photographs Ms. Pahl took. However, the Court may disregard them for purposes of the trade secrets analysis." (Doc. 88 at 3.)

The Court accepts Plaintiff's clarification that it does not contend that the certificates of insurance themselves constitute trade secrets, and that the certificates were submitted only to facilitate the Court's understanding of the documents that Plaintiff *does* contend are trade secrets: the CHLs and CIDs. This is consistent with Plaintiff's earlier representations of its trade secret theory, and Defendant identifies no meritorious grounds upon which the documents submitted to the Court pursuant to the Notice of Service of Discovery (Doc. 86) must be stricken. Accordingly, the Motion to Strike (Doc. 87) will be denied, and the Court has reviewed and considered the documents submitted pursuant to Plaintiff's Notice of Service of Discovery (Doc. 86).

### III.    Motion for Preliminary Injunction

#### a.  Legal Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). A preliminary injunction is never awarded as of right.

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

A plaintiff seeking a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure must establish that (1) he is likely to succeed on the merits of his claim; (2) he is likely to suffer irreparable harm absent the preliminary injunction; (3) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public interest. *See id.* at 20; *accord Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473, 481 (9th Cir. 2023).

A likelihood, as opposed to a possibility, of irreparable harm absent the preliminary injunction is always required. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (discussing *Winter*, 555 U.S. 7 (2008)). Where the balance of the equities tips sharply in favor of the plaintiff, however, a showing of "serious questions" regarding the merits of a case can support the issuance of injunctive relief, so long as the other elements of the *Winter* test are also met. *Id.*

### b. Analysis

#### i. Likelihood of Success on the Merits

##### 1. Trade Secrets Claim

Plaintiff argues that both the CIDs and the CHLs constitute protectable trade secrets. (Doc. 61 at 13.) Plaintiff asserts that the CIDs and CHLs are compilations of client data that are not readily accessible elsewhere and provide Plaintiff a competitive advantage in the insurance business. (*Id.* at 12-13.) Defendants counter that the CIDs and CHLs contain information readily available from either an insurance policy itself, or the relevant client. (Doc. 66 at 5-6.) In Defendants' view, the CIDs and CHLs are not the result of any substantial information-gathering efforts by Plaintiff, and Defendants further contend that Plaintiff does not take significant steps to maintain the secrecy of the information, instead freely sharing the information contained within CIDs and CHLs with clients. (*Id.* at 6-7.)

The elements of a trade secret claim under the federal Defend Trade Secrets Act ("DTSA") and the Arizona Uniform Trade Secret Act ("AUTSA") are substantially similar, and the Court will therefore analyze them together. *Compare InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653 (9th Cir. 2020), *with Calisi v. Unified Fin. Servs.,*

*LLC*, 302 P.3d 628 (Ariz. App. 2013). To succeed on its claim for misappropriation of trade secrets, Plaintiff must show: that it possessed a trade secret; that the Defendants misappropriated the trade secret; and that the misappropriation caused or threatened damage to Plaintiff. *See* 18 U.S.C. § 1839(5); A.R.S. § 44-401. Demonstrating the existence of a trade secret requires a showing of the following three elements: (1) information, (2) that derives independent economic value from being unknown to others; and (3) that the owner has attempted to keep secret. *InteliClear, LLC*, 978 F.3d at 657 (citing 18 U.S.C. §§ 1839(3), (5)); *see also Calisi*, 302 P.3d at 631 (citing A.R.S. § 44–401(4)).

A compilation of information may qualify as a trade secret under both the AUTSA and DTSA if it consists of information that is not readily available from directories or other generally available sources; however, "public availability of the information" contained within a list "raises serious questions" as to whether it qualifies as a trade secret. *AssuredPartners of Arizona LLC v. Barrios*, No. CV-25-03849-PHX-DJH, 2026 WL 482385 at *4 (D. Ariz. Feb. 20, 2026). Nonetheless, the more effort a business has expended in developing a particular compilation of information, the more likely courts are to conclude that the compilation has trade secret status, even if information contained within the compilation is theoretically public. *See Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1188 (9th Cir. 2018); *MAI Sys. Corp. v. Peak Comput., Inc.*, 991 F.2d 511, 521 (9th Cir. 1993). In *Experian*, for example, the court concluded that a trade secret could exist where a company spent more than $10 million annually to maintain a database of customer names and addresses, and where employees undertook a meticulous verification process prior to adding new entries. *Experian*, 893 F.3d at 1180.

A customer list may constitute a trade secret, but such lists generally contain client contact information, detailed purchasing history, and/or data regarding client preferences. *See, e.g.*, *Am. Fam. Mut. Ins., Co. v. Rubinstein*, No. 2:07-CV-2039-HRH, 2009 WL 10707087 (D. Ariz. Feb. 10, 2009); *AEG Holdco LLC v. Vazquez*, No. 2-21-CV-05290-VAPAGRX, 2021 WL 4859975 (C.D. Cal. Sept. 22, 2021); *Extreme Reach, Inc. v.*

- 7 -

*Spotgenie Partners, LLC*, No. CV-13-07563-DMGJCGX, 2013 WL 12081182 (C.D. Cal. Nov. 22, 2013). Courts reason that such information renders the lists economically valuable because it provides a significant advantage in soliciting business. *Id.*

Here, Plaintiff has not demonstrated a likelihood of success on its claim that either the CHLs or CIDs qualify as trade secrets. The Court will address first the CIDs, which, as discussed above, are a mere summarization of the section of a client's insurance policy that states which certificates of insurance are authorized to issue under the policy. (Doc. 72 at 3.) These forms contain no information that is not available from an insurance policy itself—which is of course readily available from a policyholder—and Plaintiff proffers nothing to show that any CID, or the particular format Plaintiff uses to create a CID, has economic value. (*See* Doc. 61.) Moreover, substantial effort is not expended in the creation of CIDs, with each one taking around thirty minutes, and at most an hour, to complete. (Doc. 72 at 4.) A particular document format or organization does not constitute a trade secret merely because it is used internally at a given company. As such, Plaintiff has not shown a likelihood, at this stage, that CIDs qualify as trade secrets.

The Court turns next to the CHLs, which are lists of third parties that hold certificates of insurance issued to a client. (Doc. 66 at 4.) Defendants present evidence that at least some certificates of insurance are publicly available on government websites. (Doc. 69 at 10-11.) This increases the likelihood that a reasonably diligent competitor of Plaintiff could acquire the information contained within a CHL simply by searching the name of a company on such a website and examining the relevant certificates. Plaintiff correctly points out that a compilation of publicly available information can be a trade secret, but as discussed above, such a compilation must have been the result of substantial efforts. Plaintiff presents nothing to show, and in fact does not argue, that the CHLs are the product of any substantial efforts. (*See* Doc. 61.) According to Pahl, CHLs are produced by taking a few moments to enter the information regarding a certificate of insurance into a computer program, and then commanding the program to generate a list showing each certificate that has been entered into the system. (Doc. 72 at 4.)

Perhaps most importantly, Plaintiff has failed to demonstrate that CHLs have economic value. CHLs are not akin to the type of customer lists that courts generally conclude are trade secrets because those lists usually include contact information and details regarding a customer's preferences or purchase history; CHLs, however, do not contain any of this information. (*See* Doc. 74-4.) Contact information is essential to pursuing clients and making a sales pitch, and purchasing history and/or client preferences are of course of use in formulating an offer of a new insurance policy or other product, but it is not clear that CHLs provide anything more than a small reduction in administrative burden *after* a client has already decided to take their business elsewhere. Therefore, Plaintiff has failed to show that CHLs are of economic value.

The parties dispute the significance of *Prudential Insurance Company of America v. Pochiro*, 736 P.2d 1180 (Ariz. App. 1987), but this case fits neatly into the general rule applied above, and therefore favors Defendants' position. In *Prudential*, the court concluded that cards with "policyholder's name, address, date of birth, policy issue age, beneficiary, relationship to beneficiary, type of policy, face amount of policy, amount of premium, frequency of premium payments, cash surrender value, loan principal balance, loan interest rate, the current dividend, the amount of dividends on deposit, the insured's choice for the handling of dividends, and the type and cost of any riders to the policy" constituted a trade secret because the information was not available publicly, and because it "was useful to a salesman in soliciting new business." *Id.* at 1181, 1183. CHLs contain far less information than the lists in *Prudential*, and it is not clear that the information CHLs contain is useful for soliciting new business or any other economically valuable purpose.

Since neither CIDs nor CHLs appear to have economic value, and because Defendants have raised serious doubts regarding the secrecy of the information contained within the CIDs and CHLs, the Court concludes that Plaintiff has failed to show a likelihood of success on its claim that the CIDs and CHLs constitute trade secrets.

. . . .

. . . .

- 9 -

### 2. Contract Claim

#### a. Contract Enforceability

The parties dispute whether the Agreement between Plaintiff and Pahl is enforceable. Plaintiff contends that the Agreement is a reasonable protection of its business interests (Doc. 61 at 10), and Defendants respond that it binds Pahl for an unreasonable amount of time, and is unreasonable as applied to Pahl because she is an "administrative employee." (Doc. 66 at 11).

There are two main types of restrictive covenants: covenants not to compete, and anti-piracy agreements. *Brown & Brown Ins. of Arizona, Inc. v. New*, No. 1 CA-CV 23-0327, 2024 WL 945687 at *2-3 (Ariz. App. Mar. 5, 2024), *review denied* (Nov. 6, 2024). "A covenant not to compete precludes former employees from working in the same business as the employers for certain periods and are disfavored." *Id.* (citing *Bryceland v. Northey*, 772 P.2d 36 (Ariz. App. 1989)). An agreement restricting a former employee from "soliciting customers of his former employer or making use of confidential information from his previous employer"—an anti-piracy agreement—"is ordinarily not deemed unreasonable or oppressive." *Id.* (citing *Hilb, Rogal & Hamilton Co. of Ariz. v. McKinney*, 946 P.2d 464 (Ariz. App. 1997)).

In Arizona, the ultimate test of enforceability for any restrictive covenant is reasonableness. *Brown & Brown Ins. of Arizona, Inc. v. New*, No. 1 CA-CV 23-0327, 2024 WL 945687 at *2 (Ariz. App. Mar. 5, 2024), *review denied* (Nov. 6, 2024). "A restrictive covenant—whether a covenant not to compete or an anti-piracy agreement—is enforceable as long as it is no broader than necessary to protect the employer's legitimate business interest." *Hilb, Rogal & Hamilton Co. of Ariz.*, 946 P.2d at 468). "An employer does have a protectable interest in maintaining customer relationships when an employee leaves." *Bryceland*, 160 Ariz. at 216; *see also Freiburger v. J-U-B Eng'rs, Inc.*, 141 Idaho 415 (2005) ("[I]f a court finds that an employer has a legitimate business interest, such a business interest is reasonably protected by prohibiting the employee from providing services to those clients with whom the employee developed customer

goodwill.").

Restrictive covenants may protect customer relationships "for as long as may be necessary to replace the employee and give the replacement a chance to show that he can do the job" and resolution of "[e]ach case hinges on its own particular facts." *Id.* "[C]lose customer contact with the attendant ability to divert customer trade" is a "strong justification" for enforcing a restrictive covenant against an individual "through whom the goodwill of the enterprise is developed and exercised." *Amex Distrib. Co. v. Mascari*, 724 P.2d 596, 604 (Ariz. App. 1986).

Here, Plaintiff has succeeded in demonstrating a likelihood of success on its argument that the Agreement entered into between Plaintiff and Pahl is enforceable. First, the Agreement is an anti-piracy agreement rather than a covenant not to compete, as the Agreement only restricts Pahl from soliciting or servicing clients with whom she had contact during her employment with Plaintiff, and from taking confidential information. It does not restrict her from working in the insurance industry. (*See* Doc. 1-1 at 6-7.) Accordingly, the Agreement should not be deemed unreasonable absent some unusually oppressive restriction.

No such restriction exists here. Plaintiff has a legitimate business interest in maintaining its customer relationships after Pahl's departure, and the Agreement's terms and duration are a reasonable means of protecting that interest. The only clients that Pahl is restrained from servicing by the terms of the Agreement are—to summarize—those as to which she received a commission or other compensation, those for which she had ongoing involvement in soliciting or selling insurance products, and those as to which she acquired Confidential Information, as defined in the Agreement. (Doc. 1-1 at 6-7.) The Agreement terms these "Restricted Clients." (*Id.*) Since the Agreement limits its restrictions to clients that Pahl developed a connection with during her time at AssuredPartners, as opposed to all AssuredPartners clients, the scope of prohibited activity is reasonably tailored.

Moreover, eighteen months is likely a reasonable span of time to subject Pahl to the

- 11 -

restrictions outlined above. At this juncture, the Court finds persuasive Plaintiff's argument that because most insurance policies renew on an annual basis, eighteen months affords Pahl's replacement time enough to demonstrate his capabilities to clients who formerly dealt with Pahl without being overbroad. Additionally, Plaintiff argues that an eighteen-month restriction is the standard for restrictive covenants in the insurance industry, and Defendants fail to respond to that argument. Although the validity of any agreement between Liberty and Pahl is not at issue here, it is noteworthy in regard to Plaintiff's "industry standard" argument that Liberty itself has now entered into a restrictive covenant with Pahl that imposes a restricted period of twenty-four months. (Doc. 61 at 10.)

Finally, Defendant leans heavily on the argument that because Pahl is merely a "clerical worker" who has "no influence over what broker a client chooses," and whose responsibilities were immediately delegated to another person, placing any restrictions on her is patently unreasonable. (Doc. 66 at 11.) However, Plaintiff indicates that Pahl had "routine client contact" and "day-to-day servicing responsibilities," which tends to show that she may have been an individual through which Plaintiff developed goodwill with its clients. (*See* Doc. 6.) This weighs in favor of finding the Agreement enforceable.

In sum, the Court concludes that Plaintiff has established a likelihood of success on its argument that the Agreement is enforceable.

### b. Breach

Plaintiff has established a likelihood of success on its argument that Pahl breached the Non-Interference and Confidential Information provisions of the Agreement, but not on its argument that Pahl breached the Non-Solicitation provisions of the Agreement.

The Confidential Information provisions of the Agreement dictate that Pahl shall not "take, copy, duplicate in any way, use, or disclose to any third party" any Confidential Information, as defined in the Agreement, for "any reason other than as intended within the scope of [her] employment." (Doc. 1-1 at 5.) Confidential Information is defined in the Agreement as "all Trade Secrets and other information that is proprietary, private, and not generally known or accessible to members of the public or competitors of Company." (*Id.*)

This includes "information relating to Employer Group's clients" and "services and products offered by Employer Group . . . including but not limited to policy forms and information [and] policy types." (*Id.*) The Court has already concluded that CIDs and CHLs do not constitute trade secrets. However, CIDs and CHLs do constitute Confidential Information as defined in the Agreement; the information contained within both types of documents is private, not generally known to the public,[1] and relates to AssuredPartners' clients and insurance services offered by AssuredPartners.

The Agreement dictates that Pahl "shall not take, copy, duplicate in any way, use, or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of [her] employment." (*Id.*) Pahl admits that she took many photographs of CIDs using her personal phone "in the event that if clients decided to make a move [to Liberty], it would make the transition easier for them." (Doc. 61-1 at 75.) Easing a client's transition to a competitor was, of course, not within the scope of Pahl's employment at AssuredPartners. Pahl's behavior in regard to CHLs was different; rather than taking pictures of the documents, she emailed copies of the documents to clients. (*See* Doc. 61-1 at 37-39.) In her deposition, Pahl stated that she did this so that the clients would have the information "if they did so choose to move." (*Id.* at 92.) She also stated that she emailed the CHLs in order to be "proactive for whoever was taking over my accounts at AssuredPartners," but given that she was "inconsistent" at sending the CHLs to clients throughout the course of her employment at AssuredPartners (*id.* at 84), it appears likely at this juncture that the motivation for sending the emails was not as intended within the scope of her employment. Instead, the motivation appears to be, as with the CIDs, facilitating the transition of clients to Liberty. As such, Pahl likely breached the Confidential Information provisions of the Agreement by taking pictures of CIDs and by sending CHLs at the conclusion of her employment with AssuredPartners.

The relevant Non-Interference provisions of the Agreement state that Pahl shall not

---

[1] As discussed above in Section III(a)(i)(1), at least some of the information contained within CHLs appears to be publicly accessible on government websites. However, given that a large proportion is not publicly available, the Court concludes that CHLs nonetheless constitute Confidential Information as defined within the Agreement.

"sell, provide, or review any Insurance Products or Related Services to any Restricted Client" or "service any Insurance Products or Related Services on behalf of any Restricted Client[.]" (Doc. 1-1 at 6.) Pahl freely admits that she has provided and continues to provide insurance services for twenty-seven Restricted Clients since joining Liberty. (Doc. 61-1 at 111, 247.) In their response to Plaintiff's Motion for Preliminary Injunction, Defendants do not attempt to argue that Pahl has not breached the Non-Interference portions of the Agreement. (Doc. 66 at 9.)

Finally, the relevant Non-Solicitation provisions of the Agreement state that Pahl shall not "solicit . . . any Insurance Products or Related Services to any Restricted Client[.]" (Doc. 1-1 at 6.) Plaintiff presents no evidence that Pahl herself was responsible for soliciting any client to transfer its business from Plaintiff to Liberty. Providing insurance services after a client has moved its business constitutes a breach of the Non-Interference provisions of the Agreement, but such behavior does not equate to asking a client to transfer its business, which is the action contemplated by the term "solicit." *Alpha Tax Servs., Inc. v. Stuart*, 761 P.2d 1073, 1075 (Ariz. App. 1988) ("'Solicit' is defined as: 'To ask for with earnestness, to make petition to, to endeavor to obtain, to awake or excite to action, to appeal to, or to invite.'") (citing Black's Law Dictionary, 3rd ed., p. 1639). Indeed, the evidence submitted by Plaintiff tends to show that it is Pahl's superior, Ray Clem, who was the force behind convincing clients of Plaintiff's to transition business to Liberty; in text messages, Clem stated that "[i]n the first hour *I start calling* I am anticipating" various clients of Plaintiff's to make the move to Liberty. (Doc. 61-1 at 182.) Accordingly, it does not appear at this juncture that Pahl solicited Plaintiff's clients in violation of the Agreement.

In sum, Plaintiff has established a likelihood of success on its argument that Pahl breached the Non-Interference and Confidential Information provisions of the Agreement, but not on its argument that Pahl breached the Non-Solicitation provisions of the Agreement.

. . . .

**ii.  Irreparable Harm**

Having concluded that Pahl likely breached the Non-Interference and Confidential Information provisions of the Agreement, the Court must next address whether Plaintiff has demonstrated that it is likely to suffer irreparable harm absent the issuance of a preliminary injunction.

Plaintiff is likely to suffer irreparable harm unless Pahl is restrained from violating the Non-Interference portions of the Agreement. As discussed in relation to the enforceability of the Agreement, "[a]n employer does have a protectable interest in maintaining customer relationships when an employee leaves." *Bryceland*, 160 Ariz. at 216. Pahl continues to openly flout the Agreement insofar as she is required to refrain from providing insurance services to Restricted Clients, causing continuous harm to Plaintiff's ability to maintain its customer relationships. (*See* Doc. 61-1 at 111, 247.) Although Defendants characterize Pahl as merely a "clerical" person (Doc. 66 at 11-12), she does have "daily" contact with clients and is likely responsible for at least some measure of client goodwill. (Doc. 61-1 at 47.) However, injunctive relief requiring Pahl to refrain from soliciting current or former clients of AssuredPartners is inappropriate. As discussed in the preceding section, Plaintiff offers no evidence showing that Pahl has ever been responsible for soliciting Plaintiff's clients, nor does Plaintiff show that Pahl has any intention of soliciting Plaintiff's clients in the future.

Finally, it is not clear that injunctive relief should issue to correct Pahl's violations of the Confidential Information provisions of the Agreement. "[I]njunctive relief requires a showing that the threat of injury in the future is 'certainly impending' or that it presents a 'substantial risk' of recurrence." *Assuredpartners of California Ins. Servs., LLC v. Clem*, No. 2:25-CV-11856-JAK (AGRX), 2026 WL 790780 at *3 (C.D. Cal. Mar. 18, 2026) (citing *Munns v. Kerry*, 782 F.3d 402 (9th Cir. 2015)). Whatever harm that resulted to Plaintiff due to Pahl's misuse of Confidential Information is a past harm; Pahl does not continue to use the pictures she took, and Liberty has quarantined the pictures and asked for Plaintiff's permission to delete them. (Doc. 61-1 at 113, 233-36.) Plaintiff argues that

irreparable harm continues to be done due to the fact that "the information is now embedded in Liberty's systems," but this argument ignores that the clients whom the Confidential Information relates to have already taken their business to Liberty. Since they are now clients of Liberty, ordering deletion of their information will mean only that Liberty must contact the clients and re-compile the information.[2] The broad injunctive relief that Plaintiff requests that the Court issue will not bring the clients back to Plaintiff, and is inappropriate to remedy a harm that does not appear to be ongoing.

### iii. Balance of Equities

The balance of equities tips in favor of Plaintiff insofar as injunctive relief should issue to halt Pahl from continuing to provide insurance services to Restricted Clients in violation of the Non-Interference terms of the Agreement. Restraining Pahl from such action will not prevent her from continuing to provide insurance services for other clients, and will merely require her to abide by the terms of the contract that she entered into.

### iv. Public Interest

"[T]he public interest is served when the courts enforce valid contracts." *Hillstone Rest. Grp. Inc. v. Houston's Hot Chicken Inc.*, No. CV-22-02004-PHX-MTL, 2023 WL 110926 (D. Ariz. Jan. 5, 2023). Non-parties to this action—namely, Restricted Clients— may be somewhat affected by no longer having Pahl to service their insurance needs, but Defendants present no evidence that another worker could not be assigned to take over Pahl's duties regarding Restricted Clients.

### c. Bond

The Federal Rules of Civil Procedure state that a preliminary injunction may only issue where the "movant gives security in an amount the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). District courts are "afforded wide discretion in setting

---

[2] *See AssuredPartners of Ariz. LLC v. Barrios*, No. CV-25-03849-PHX-DJH, 2026 WL 482385 at *9 (D. Ariz. Feb. 20, 2026) ("[Defendant] may have been well-advised to delete his old contacts and re-compile them, but, as he has his own access to the clients' contact information, it is not clear to the Court how the retention of the contact information causes or will cause Plaintiff irreparable harm.").

the amount of the bond." *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003). The bond amount may be zero if there is no evidence that the party against whom an injunction is entered will suffer damages. *Gorbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000). Here, it does not appear that Pahl will suffer damages if she is required to stop providing insurance services to Restricted Clients. Accordingly, the Court will set the bond amount at zero.

## IV.    Conclusion

For the foregoing reasons, the Court finds that Plaintiff has established a likelihood of success on its argument that Pahl has breached the terms of her Restrictive Covenants Agreement, that there is a likelihood of irreparable harm if she is not restrained from continuing to provide insurance services to Restricted Clients, and that the balance of equities and the public interest tip in favor of restraining Pahl from continuing to provide insurance services to Restricted Clients.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Preliminary Injunction (Doc. 61) is **granted in part** and **denied in part** as set forth above.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike (Doc. 87) is **denied**.

**IT IS FURTHER ORDERED** that as to the twenty-seven Restricted Clients Defendant Pahl previously worked with at AssuredPartners and now works with on behalf of Liberty—Aldersgate Construction and Investment; Arbee, Inc.; Bodagger Enterprises, LLC; Brothers International Desserts, Inc.; Cabrillo Cooperative Housing Corporation; California Traffic Control; Delta Space Corp.; DVCB, Inc.; Freska Produce International; G&R Concrete; Gold Coast Ingredients; GW Surfaces; Hartigan/Foley GBC, Inc.; HCS Transportation, Inc.; Hebert Family Trust; Heredia Enterprises, LLC; Hill Crane Service, Inc.; JNL Glass, Inc.; JIPC Management Holdings, Inc.; Kodiak Construction; La Folette; Limoneira; Longitude 123; Pool Surfacing, Inc; Press Courier Apartments; Rayco Roofing; and Werner Tile—Defendant Pahl is **enjoined** from: (1) continuing to sell, provide, or

renew any Insurance Products or Related Services; or (2) continuing to service any Insurance Products or Related Services. This injunction shall expire **eighteen (18) months** after the date that Defendant Pahl's employment with AssuredPartners ended.

Dated this 17th day of June, 2026.

_____
Honorable Rosemary Márquez
United States District Judge